UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| VISALUS, INC., | § | CASE NO. 24-42952 |
| | § | (Chapter 11, SubV) |
| | § | |
| DEBTOR. | § | |

**VISALUS, INC.'S RESPONSE AND OBJECTION TO CREDITOR LORI
WAKEFIELD'S MOTION TO CONVERT CASE TO CHAPTER 7**

TO THE HONORABLE BRENDA T. RHOADES, CHIEF U.S. BANKRUPTCY JUDGE:

Debtor and Debtor in Possession ViSalus, Inc. (the "Debtor" or "ViSalus") files this
response and objection to the *Motion of Lori Wakefield, individually and behalf of all other
similarly situated, to Convert Case to Chapter 7* [Dkt. No. 63] ("MTC") and in support of this
objection states as follows:

**I.      RESPONSES REQUIRED BY LBR 9014-1(b)(2)[1]**

1.      Debtor ADMITS the factual allegations in paragraphs 1-3, 5, 7, and 8.

2.      The Debtor ADMITS the allegations in paragraph 4, except the Debtor DENIES
the allegations that the "Debtor has not done any business since at least 2020" and that its historical
business operations were a "pyramid scheme."

3.      The Debtor ADMITS that it previously operated a networking marketing business
and that it has not operated this business line since 2020 as alleged in paragraph 6.  The Debtor
ADMITS that it sold substantially all its assets to Pruvit, Inc. in 2020.  The Debtor further ADMITS
that its only assets for administration as of the Petition Date consist of various intellectual property

---

[1] Local Rule of Bankruptcy Procedure 9014-1(b)(2) requires that objections in contested matters conform to the
requirements of Fed. R. Civ. P. 8(b).  However, in this case numbered paragraphs in the MTC do not contain
allegations that are "simple, concise, and direct."  *See* Fed. R. Civ., P. 8(d)(1).  For the avoidance of any doubt, the
Debtor denies some aspect of each allegation in the MTC that is does not expressly admit herein.

and tax attributes in the form of net operating losses ("NOLs") but adds that the Debtor had, in addition, a de minimis amount of cash in escrow accounts as well as retainers held by its attorneys to secure legal fees and that the Debtor does not believe it has contingent or unliquidated claims that can viably be pursued.  The Debtor DENIES the remaining factual allegations, and innuendo of wrongdoing, in paragraph 6.

4.      Paragraph 9 refers to and characterizes the terms of a document on the record which speaks for itself, and no response is required.  Answering further, the Debtor responds that it is preparing a First Amended Plan pursuant to 11 U.S.C. § 1193(a) that it expects to file shortly.[2]

5.      Paragraph 10 is a request for relief for which no response is required.

6.      Paragraphs 11-12, 14, and 17 are legal argument for which no response is required. To the extent the Court deems that a response is required, the Debtor DENIES the same.

7.      The Debtor DENIES the factual allegations in paragraph 13.

8.      In response to paragraph 15, the Debtor ADMITS that its historical business line of marketing nutritional products and dietary supplements had ceased in 2020.  The Debtor ADMITS that it retains certain assets to facilitate its proposed wind-down.  The Debtor further ADMITS that bankruptcy counsel was paid prepetition retainers.  The Debtor DENIES the remaining allegations in paragraph 15.

9.      In response to paragraph 16, the Debtor ADMITS that as a practical matter the NOLs have value only in a chapter 11 proceeding in this case, but qualifies that as a legal matter, the NOLs are valuable in a variety of contexts.

10.      The Debtor ADMITS that it has not filed documents in this case related to the travel-related business at its subsidiary, and it DENIES the remaining allegations in paragraph 18.

---

[2] Bankruptcy Code section 1193(a) provides in relevant part that a subchapter V debtor may modify a plan at any time before confirmation and after the modification is filed with the court, the plan as modified becomes the plan.

11.     Paragraph 19 is a legal argument, which characterizes the terms of a document on the docket, to which no response is required.  The Debtor DENIES the allegation or insinuation that the Debtor's revenue decline was related to poor management as opposed to the potential liability in the Wakefield matter.

12.     The Debtor DENIES it has acted in bad faith either pre- or post-petition.  The remaining statements in paragraph 20 are legal argument to which no response is required.

13.     The Debtor DENIES that it wrongfully concealed the sale of its assets to Pruvit, Inc. in 2020.  The remainder of paragraph 21 is legal argument, to which no response is required.

14.     The allegations in paragraph 22 consist entirely of speculative innuendo and, therefore, the Debtor DENIES them.

15.     The Debtor ADMITS the allegation in paragraph 23 that it has nominal current incoming cash flow/monthly income (income only consists of interest on its funds held in an escrow account) and no current employees but DENIES these are indicative of bad faith when a debtor states an intention to conduct an orderly wind-down process.

16.     With respect to the factual allegations in paragraph 24, the Debtor DENIES it did anything wrong or improper in filing this case or to otherwise "get around" the judgment in a case where it actively participated and defended itself on the merits in on-going litigation for nine years. The Debtor ADMITS that Ms. Wakefield obtained documents relevant to the sale of a majority of the Debtor's assets in 2020.  However, the Debtor DENIES any suggestion that it had an obligation to turn over sales related information before judgment entered or that it actively concealed the sale. The Debtor further clarifies that Dkt. No. 480 in the pre-bankruptcy litigation with Ms. Wakefield that is referenced in paragraph 24 is an entry of partial judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure in the amount of $638,125 which was entered after the Debtor

disclosed to the Court and Ms. Wakefield that it could not afford, outside of a chapter 11 process, to undertake the claims and noticing process.

17.    Paragraphs 25 and 26 consist of legal argument, for which no response is required.

## II.    SUMMARY OF FACTUAL AND PROCEDURAL BACKGROUND RELEVANT TO THE DEBTOR'S RESPONSE TO MTC

18.    The Debtor filed a voluntary petition under chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and elected subchapter V on December 5, 2024 (the "Petition Date").

19.    The Debtor is a holding company that, at one time, marketed nutritional products and dietary supplements in the United States and internationally through multiple subsidiaries.

20.    Due to the Debtor's financial insolvency – caused in no small part by expenses it incurred during the nearly nine years of litigation and an adverse decision in the Wakefield Litigation (which is described more fully below) – the Debtor's primary purpose in filing this subchapter V case was to effectuate an orderly wind-down of its business and monetize assets that are valuable in the context of this chapter 11 proceeding.

### A.    The Wakefield Litigation

21.    The Debtor ceased its historical business operations more than four (4) years ago largely because of business contractions related to the class action lawsuit *Wakefield v. ViSalus, Inc.* (D. Oregon, Case No. 3:15-cv-1857-SI) (the "Wakefield Litigation").

22.    In a nutshell, the entirety of the Wakefield Litigation consists only of claims alleging the unlawful transmission of text messages, and no physical or mental harm to any person pursued by class action counsel.

23.    Ms. Wakefield filed her initial complaint in the Wakefield Litigation on October 1, 2015. The complaint alleged violations of the Telephone Consumer Protection Act ("TCPA"),

alleging that the Debtor unlawfully sent her and other class members automated telephone calls that violated the act. *See* 47 U.S.C. § 227(b)(1).

24.     After extensive pre-trial proceedings in the District Court, the Wakefield Litigation went to trial in April 2019.

25.     After a three-day trial, the jury returned a verdict against the Debtor and awarded damages in the amount of $925,220,000.

26.     After various post-trial motions were denied, the Debtor appealed the judgment to the Ninth Circuit Court of Appeals.

27.     On October 20, 2022, the Ninth Circuit ruled on the Debtor's appeal. The Ninth Circuit determined that the nearly $1 billion damages award may potentially be unconstitutionally excessive and remanded the matter to the District Court for further proceedings consistent with its ruling.

28.     On April 26, 2024, after initial post-remand proceedings, the District Court issued an order staying its judgment until after a claims process was completed and directed the Debtor to conduct a "class notification and claims processing" procedure.

29.     The Debtor sought bids from claims processing agents and determined that the cost of running the process ordered by the District Court far exceeded the Debtor's cash on hand.

30.     Shortly before the Petition Date, on October 2, 2024, the District Court entered a partial final judgment in the Wakefield Litigation in the amount of $638,125 for the claims processing costs.

**B.     The Debtor's Assets**

31.     As of the Petition Date, the Debtor has had only a few valuable assets, all of which the Debtor proposes to monetize through its proposed subchapter V plan.

32.     First, the Debtor has unused net operating losses ("NOLs") for tax years 2013, 2015-2019 and 2021 which total $63,803,436.  *See* Schedule A/B at Dkt. No. 17.

33.     Second, the Debtor, through its ownership of a subsidiary, has certain intellectual property (including internet domain names and websites) as described more fully in the Debtor's Schedule A/B.  *Id*.

34.     Because of the rules, regulations and laws concerning the transfers of NOLs, the Debtor's NOLs likely only have value in the context of a Chapter 11 proceeding.

35.     Outside of bankruptcy, NOLs are often lost when a company is sold, because there is a change of ownership of more than 50%.  *See* 26 I.R. § 172.  The Internal Revenue Code has an exception, however, for chapter 11 bankruptcy proceedings.  In certain circumstances, transfer of equity interests to creditors under a chapter 11 plan do not "count" for purposes of the IRS's change of control regulation.  *Id.* at § 382.  Accordingly, in chapter 11, the Debtor can propose to transfer more than 50 percent of the equity in the reorganized debtor without automatically triggering the "change of control" provisions.  This exception is not available in chapter 7.  And, of course, if the case were dismissed, the Debtor would have no hope of soliciting investment from third parties given the unresolved $925 million potential liability.

**C.     Key Terms of the Debtor's Forthcoming Proposed First Amended Plan**

36.     The Debtor is preparing to file a First Amended Subchapter V Plan (the "1M Plan").

37.     As detailed in the forthcoming 1M Plan, the Debtor will propose creating a post-confirmation liquidating trust, with an independent trustee, that may pursue causes of actions (in addition to taking steps to attempt to monetize the Debtor's NOLs and its subsidiary's intellectual property assets).

38.     The Debtor understand that Ms. Wakefield takes the position in the MTC that she believes there are valuable claims related to the 2020 sale of the Debtor's assets to Pruvit, Inc.  The

Debtor disagrees and believes these claims have no value. However, to the extent these claims do have value, the Debtor's forthcoming 1M plan allows the liquidating trustee to investigate and pursue them.

### III.    REPLY TO ARGUMENT AND AUTHORITIES

39.    Ms. Wakefield claims "cause" exists to convert this chapter 11 case to chapter 7. The Bankruptcy Code provides that the Court may dismiss or convert a chapter 11 case "for cause." 11 U.S.C. § 1112(b). Section 1112(b)(4) provides a "non-exhaustive list of examples that would support dismissal or conversion." *In re Turkey Leg Hut & Co., LLC*, 665 B.R. 129, 138 (U.S. Bankr. S.D. Tex. 2024). "When determining 'cause', the Court must also consider the totality of the circumstances." *Id.* These legal standards are not in dispute. *See* MTC ¶¶ 11-12.

40.    However, Ms. Wakefield oversimplifies the legal standard applied when she states simply that the Court "shall" convert if a movant establishes "cause." *See* MTC ¶ 11. Instead, the court applies the following burden shifting analysis when considering a motion to dismiss or convert pursuant to §1112:

> […] [T]he moving party bears the initial burden to establish "cause" by a preponderance of the evidence. Once the movant shows "cause," the burden shifts to the debtor to establish the exceptions in § 1112(b)(2). However, if the movant demonstrates that there is cause for conversion or dismissal under § 1112(b)(4), then conversion or dismissal is mandatory, unless the court determines the appointment of a Chapter 11 trustee or an examiner under § 1104 is in the best interests of creditors and the estate. However, the appointment of a trustee or examiner under § 1104(a) is not an available option in Subchapter V cases because § 1181 makes § 1104 inapplicable to Subchapter V cases.

*In re Turkey Leg Hut & Co. LLC*, at 138 (internal citations omitted). The burden on the party seeking conversion or dismissal is not an easy one to meet. "Conversion or dismissal is a drastic measure and the movant bears the burden of proving that the relief requested is warranted and not

premature." *In re Waterworks, Inc.*, 538 B.R. 445, 460 (Bankr. N.D. Ill. 2015) (internal quotations omitted).

41.     Specifically, if the Court finds the movant has met its burden to establish "cause" (which Ms. Wakefield has not done) then the Court:

> must abstain from converting the case to chapter 7 if 'the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate and the debtor or another party in interest establishes: (1) that there is a reasonable likelihood of plan confirmation; and (2) that the grounds for converting or dismissing the case include an act or omission of the debtor other than under § 1112(b)(4)(A).

*Id*; *see also* 11 U.S.C. § 1112(b)(2).

**A.     Claimant Fails to Establish Substantial or Continuing Loss to Diminution of the Estate and Debtor Has a Reasonable Likelihood of Confirming a Subchapter V Plan of Reorganization [MTC ¶¶ 13-19].**

42.     Ms. Wakefield argues the estate is being diminished by administrative fees and lack of sufficient cash flow to fund a reorganization.  Ms. Wakefield primarily rests this argument on the uncontroverted fact that prepetition the Debtor sold the assets central to its legacy business – marketing nutritional and weight loss supplements – in 2020 and does not plan to restart this business line.  When a debtor can otherwise show it has sufficient liquidity to satisfy administrative expenses and simultaneously proposes a plan that may result in higher return for creditors outside chapter 7 (as the 1M Plan does), then simply showing that a debtor's plan is a liquidating, or similar, plan is insufficient to find diminution of the estate.  *See* 11 U.S.C. §§ 1191(a) & 1129(a)(11); *In re M.A.R. Designs & Constr., Inc.*, 653 B.R. 843, 856 (Bankr. S.D. Tex. 2023) ("The mere fact that Debtor's plan is a liquidating plan is insufficient to find diminution of the estate. Debtor not having operating funds for [its legacy business operations] may be a consequence of its liquidating plan, but this does not demonstrate diminution of the estate.").

43.     The Debtor's legal counsel has adequate advance payment retainers that were funded pre-petition, fully disclosed to all parties and the Court in the Debtor's motion to retain counsel, and are expected to cover the Debtor's anticipated administrative legal expenses. *See* Dkt. No. 15 at ¶¶ 13-14. This case is distinguishable from other chapter 11 cases where the Debtor requires on-going cash flow to fund significant administrative legal expenses. In this case, Ms. Wakefield has not met her burden that there is any likelihood of administrative insolvency.

44.     Ms. Wakefield's argument for alleged "substantial or continuing loss to or diminution of the estate" largely relies on events that occurred some point pre-petition and allegedly continued until the Petition Date. *See* MTC ¶ 15. This argument does not focus on the relevant post-petition time period during which substantial or continuing loss or diminution is analyzed under § 1112(b)(4)(A). The relevant inquiry to determine "substantial or continuing loss to or diminution of the estate" must instead focus on post-petition cash flow (i.e., only the cash flow once the estate itself is created). *See In re Santiago*, No. 15-06132 (ESL), 2015 WL 5919926, at *6 (Bankr. D.P.R. Oct. 9, 2015) (The first prong of §1112(b)(4)(A) "tests whether, *after the commencement of the case*, the debtor has suffered or continued to experience a negative cash flow, or, alternatively declining asset values.") (quoting Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶ 1112.04[6][a] (16th ed. 2015) (emphasis added).

45.     Ms. Wakefield has not asserted any claim that the Debtor has failed to pay any expenses arising during the pendency of the case thus far. Moreover, the Debtor's most (potentially) valuable assets are its Liv subsidiary's intellectual property and its NOLs. The value of these assets is not dwindling in bankruptcy. To the contrary, these assets only have value to creditors in a chapter 11 proceeding, and conversion or dismissal would substantially diminish

their value.  Accordingly, Ms. Wakefield has not met her burden to establish the first prong of § 1112(b)(4)(A).

46.     As the Debtor is not experiencing substantial or continuing losses or diminution in value, the Court's inquiry ends there.  However, to the extent the Court considers the second prong of § 1112(b)(4)(A), Ms. Wakefield's arguments are also unavailing.

47.     The value of the Debtor's assets (principally the Liv intellectual property and the Debtor's NOLs) is dependent upon its continued operations and existence in chapter 11.  The parties are in agreement that the Debtor will not be "rehabilitating" its nutrition and weight loss business.  However, the Debtor's 1M Plan does expressly contemplate monetizing its subsidiary's intellectual property and preserving the value of the Debtor's substantial tax attributes.  Accordingly, Ms. Wakefield has not met her burden to show there is an absence of reasonable likelihood of rehabilitation under the circumstances of this particular chapter 11 case.  In any event, these issues are better suited for the Court to consider in the context of a plan confirmation hearing.

**B.      This Subchapter V Chapter 11 Case was Not Filed in Bad Faith [MTC ¶¶ 20-24].**

48.     Ms. Wakefield's arguments that the Debtor filed this case in bad faith all turn on the fact that there are limited assets available to the class action plaintiffs, and their attorneys, after nearly nine years of litigation.  Being insolvent at the time of a bankruptcy filing is certainly not an indicium of bad faith.  Here, the Debtor has proposed the 1M Plan that facilitates a liquidating trustee investigating, and pursuing if appropriate, the causes of action that the plaintiffs believe are so valuable.

49.     It is undisputed that the Debtor sold its assets to Pruvit, Inc. in 2020.  At this time, the Debtor was in the midst of significant – and expensive – post-trial briefing and preparing to bring an appeal to the Ninth Circuit Court of Appeals in 2021.  It had, as it still does, a potential

$925 million liability to the *Wakefield* class. Not unexpectedly, the Debtor faced liquidity issues at this time. The Wakefield Litigation was expensive and significantly contributed to the Debtor's ultimate insolvency. Ms. Wakefield has not met her burden, nor is there any evidence, that the Debtor's sale of its nutrition and weight loss business segment was sold for less than its reasonable value.

50.     There is nothing nefarious or bad faith regarding the timing of the Debtor's petition. In connection with the Wakefield Litigation, the Debtor determined that the cost of running the process ordered by the District Court far exceeded the Debtor's cash on hand. The Debtor was always candid with the District Court that it did not have funds to pay for the proposed claims process. Shortly before the Petition Date, on October 2, 2024, the District Court entered a partial final judgment in the Wakefield Litigation in the amount of $638,125 for the claims processing costs. The Debtor did not have cash on hand to satisfy even this partial judgement and filed its bankruptcy petition to reorganize and preserve the value of its assets.

51.     While the Debtor agrees with Ms. Wakefield's factual allegations that it does not have current incoming cash flow and has no employees, these facts alone are not indicative of bad faith in circumstances such as these. Here, the Debtor is eligible to proceed in subchapter V and there is no statutory basis to impose an additional requirement that the Debtor have current W-2 employees. *See In re Port Arthur Steam Energy, L.P.*, 629 B.R. 233, 237 (Bankr. S.D. Tex. 2021) ("[The movant] points out that [the debtor] did not have W-2 employees, but neither do many U.S. small businesses, and, regardless, that is not required under Section 1182(1)(A) [the code provision describing the requirements for a debtor to proceed under subchapter v]. This Section also does

not require a debtor to maintain its core or historical business operations on the petition date. It requires that the debtor was engaged in commercial or business activities.").[3]

52.     While the claims asserted by Ms. Wakefield are significant [*see* POC No. 004], the Debtor has also attempted to resolve tax claims on behalf of itself and its subsidiaries.  For example, the Internal Revenue Service filed a claim for $18,582.86 [*see* POC No. 001] and the Massachusetts Department of Revenue filed a claim for $2,856.45 [*see* POC No. 002-2].  In addition to these taxing authorities, the Debtor continues discussions with the Italian taxing authority for alleged taxes owed by the Debtor's subsidiary, Vi Italia S.R.L.  In the Debtor's 1M Plan, the Debtor will propose orderly wind down of its business to resolve these debts.

53.     While Ms. Wakefield has referenced certain facts that she argues "in and of themselves indicate bad faith" [MTC ¶ 23], a majority of the factors articulated by the Fifth Circuit Court of Appeals in its seminal case analyzing "bad faith" in Chapter 11 cases is not present in this case.[4]  In *Matter of Little Creek Development Co.*, the Fifth Circuit summarized the following fact pattern which may be indicative of bad faith/lack of good faith: (1) the debtor has one asset, which is a tract of real property; (2) the debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors; (3) the debtor has few employees; (4) the property is the subject of a foreclosure action as a result of arrearages on the debt; (5) the debtor's financial problems involve essentially a dispute between the debtor and a secured creditor which can be resolved in a pending state court action; and (6) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

---

[3] Examples of engaging in commercial or business activities include litigating a lawsuit, filing tax returns as required by state and federal agencies, negotiating with creditors and preserving asset value are all commercial and business activities.  Any suggestion or insinuation by the Ms. Wakefield that the Debtor is not engaged in commercial or business activities is misplaced.

[4] The lower court decisions cited by Ms. Wakefield in her MTC ¶¶ 20-24 both cite heavily to the *Little Creek Development Co.* decision.  *See In re M.A.R.*, 653 B.R. at 867-68 and *In re Ozcelebi*, 639 B.R. at 396.

*Matter of Little Creek Dev. Co.*, 779 F.2d 1068, 1072–73 (5th Cir. 1986); *see also In re Scotia Pacific Co., LLC,* 508 F.3d 214, 223 (5th Cir. 2007) (applying the *Little Creek* factors post-BAPCPA).  While not every factor must be present in every case for a movant to meet their burden of establishing bad faith on the part of a debtor, the small number of factors present in this case certainly forestall any potential finding of bad faith under the present circumstances.  *See Elmwood Dev. Co. v. General Elec. Pension Trust (In re Elmwood)*, 964 F.2d 508, 510 (5th Cir.1992) ("A collation of factors, rather than any single datum, controls resolution of the issue. In determining whether a petition was filed with the requisite good faith, the court must examine the facts and circumstances germane to each case.").  Here, the Debtor has no secured creditors, sought bankruptcy protection to allow it to preserve value, wind down its existing business and commercial affairs in an orderly fashion, and provide unsecured creditors appropriate treatment under subchapter V of the Bankruptcy Code.

54.     Here, the value of the Debtor's tax attributes, specifically its NOLs, are "unusual circumstances" establishing that converting or dismissing the case is not in the best interests of creditors and the estate.  This value, which is less speculative than a potential recovery from causes of action in a chapter 7 case where any trustee will need significant resources to even begin to investigate, can be preserved through a subchapter V, chapter 11 plan process.  While Ms. Wakefield's MTC cited a number of objections to the Debtor's plan as a basis to convert this case to one under chapter 7, the Debtor will address many of those concerns in its forthcoming 1M Plan.  Accordingly, the Debtor should be given a fair opportunity to liquidate through the subchapter V process.

## IV.     CONCLUSION

There has been no "bad faith" in filing this subchapter V chapter 11 case and no "cause" exists under § 1112.  Wherefore, the Debtor respectfully requests that the Motion to Convert be

denied in all respects and for such other and further relief to which this Debtor is justly entitled,

both at law and in equity.

Dated: June 18, 2025                         Respectfully submitted,

                                             */s/ Christopher E. Prince*
                                             Christopher E. Prince (CA SBN 183553)
                                             LESNICK PRINCE PAPPAS & ALVERSON LLP
                                             315 W. Ninth St., Suite 705
                                             Los Angeles, CA  90015
                                             T: (213) 493-6496
                                             F: (213) 493-6596
                                             E: cprince@lesnickprince.com

                                             *Counsel for Debtor and Debtor in Possession*
                                             *ViSalus, Inc.*

                                             -and-

                                             Jeff Carruth (TX SBN 24001846)
                                             WEYCER, KAPLAN, PULASKI & ZUBER, P.C.
                                             2608 Hibernia, Suite 105
                                             Dallas, TX 75204-2514
                                             T: (713) 341-1158
                                             F: (713) 961-5341
                                             E: jcarruth@wkpz.com

                                             *Local Counsel for Debtor and Debtor in Possession*
                                             *ViSalus, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served on June 18, 2025 by electronic notice to all ECF users who have appeared in this case to date.

                                             */s/ Christopher E. Prince*
                                             Christopher E. Prince