**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| VISALUS, INC., | § | CASE NO. 24-42952 |
| | § | (Chapter 11, SubV) |
| | § | |
| Debtor. | § | |

**RENEWED OBJECTION TO SECOND AMENDED PLAN OF VISALUS INC.
DATED JANUARY 29, 2026 OF LORI WAKEFIELD, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

Creditor Lori Wakefield, on her own behalf and on behalf of a certified class, files this *Renewed Objection to Second Amended Plan of ViSalus, Inc. Dated January 29, 2026* (the "Objection"). Hoping the third time's the charm, Debtor, ViSalus, Inc. again seeks confirmation of its novel liquidation-reorganization plan. But like its prior iterations, it seems minimal effort was exerted to provide the Court and the creditors with details necessary to demonstrate that the plan is feasible or fair to creditors. As set forth below, confirmation should be denied.

**I.     Background and Procedural History.**

1.     The Debtor once ran an apparently successful "network marketing" business, which sold weight loss supplements in several countries. *See Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 592 (E.D. Mich. 2015) (detailing debtor's operations and finding that "[t]he Court believes that the Plaintiffs' allegations … plausibly allege that the ViSalus Program is a pyramid scheme").

2.     Lori Wakefield is the court-appointed representative of a certified class that litigated claims under the Telephone Consumer Protection Act, 47 U.S.C. § 227, against the Debtor. The certified class largely prevailed at trial, and a verdict was entered in an amount not to exceed $925,218,000, with an additional $2,000 for Wakefield herself. Wakefield successfully

ClarkHill\N0940\507107\286647282.v2-2/26/26

defended the jury verdict on appeal. *See generally Wakefield v. ViSalus, Inc.*, 51 F.4th 1109 (9th Cir. 2022).

3.      The instant bankruptcy proceeding came about for two reasons. First, in the midst of the *Wakefield* litigation, and, it seems, in the midst of active settlement negotiations, the Debtor's principals elected to cash out by selling nearly all of the Debtor's assets to Pruvit, Inc. and secretly resolved valuable malpractice claims arising from the *Wakefield* litigation. The Debtor's papers feign some incredulity that the *Wakefield* litigation continued post-sale, but the simple fact is that neither the sale nor the resolution of the malpractice claims were disclosed in the litigation to Wakefield or the district judge (even as the parties litigated how large a damages award the company could withstand). Although the sale appears to have left the Debtor insolvent, the company did not immediately declare bankruptcy. Second, once the Debtor had exhausted their avenues to challenge the jury verdict, *see ViSalus, Inc. v. Wakefield*, 143 S. Ct. 1756 (2023), Wakefield initiated a claims process for members of the absent class, and began efforts to locate assets that could be used to compensate the class. At this point, the Debtor filed to reorganize under Chapter 11.

4.      The Certified Class is the largest creditor and the Certified Class's claim is the only substantial, non-tax claim on the estate. (See Dkt. 2 (list of largest creditors).)

5.      Katharine Battaia Clark is the Subchapter V Trustee.

6.      The mid-litigation sale left the Debtor with two assets: around $63 million in net operating losses that, theoretically, could be used to offset its tax burden, and intellectual property related to "Liv Global," purportedly a defunct travel business that had been operated (at some unknown time) by the Debtor. As Wakefield previously explained, there also is good reason to believe the estate holds valuable claims, potentially against the current insiders, relating to the

Pruvit sale and the sale of the malpractice claims related to its counsel in the *Wakefield* litigation. (See Dkt. 62, ¶¶ 18-21.)

7.      In March 2025, Debtor filed its Plan of Reorganization. (Dkt. 42.) Before a hearing on plan confirmation was held, Debtor filed its First Amended Plan in July 2025. (Dkt. 74.) The First Amended Plan proposed to establish a trust to pursue any claims owned by the estate, and to solicit investment to "reactivate" a travel business in order to utilize the Liv Global IP.

8.      On behalf of the Certified Class, Wakefield objected to the Plan and First Amended Plan, principally on the grounds of feasibility and good faith. (See Dkt. 62.) As explained in that objection and in the hearing on plan confirmation, the First Amended Plan was almost entirely devoid of specifics: it did not identify any potential trustees, did not identify any potential investors, did not explain how the reactivated travel business would be able to stand on its own two feet, and did not explain how creditors would recover anything. The Court largely agreed. (*See* Dkt. 79, at 77:9-78:8 (finding that the First Amended Plan provided no specifics about the proposed trust, no specifics about how the plan would be implemented, or how distributions would be made, and observing that "[i]n fact, what I got was, I'm a salesman and I don't do accounting and I don't do projections, or taxes, all of those things. That's not good enough").

9.      In January 2026, Debtor filed the Second Amended Plan. (Dkt. 90.) As explained below, while the Second Amended Plan offers several of the missing details, Debtor still fails to demonstrate feasibility or that the Second Amended Plan is fair and equitable to creditors.

**II.     Confirmation should be withheld until an updated Trust Agreement is provided.**

10.     The Second Amended Plan, like the prior iterations of the plan, is pitched as a combination liquidation-reorganization plan. The "liquidation" piece is premised on the apparently universal understanding that "there is nothing here except potential claims and causes of action,

unless the IP and the NOLs can be monetized." (Dkt. 79, at 61:11-13.) Wakefield's previous objection set forth the case that these claims may well be valuable, but are likely held against the Debtor's insiders. (Dkt. 62, ¶¶ 18-21.) All versions of the Plan have proposed to transfer these claims to a Trust, so that they can be pursued by the Trustee. Prior versions of the Plan, however, failed to identify potential trustees, or guarantee that the Trust would not be controlled by persons friendly to the likely defendants (Blake Mallen and Nick Sarnicola) in any lawsuit brought by the Trust.

11. The Second Amended Plan *appears* to rectify these deficiencies. Wakefield's only lingering concern is that while her counsel was provided with a draft Trust Agreement many months ago, the Second Amended Plan differs in material respects from the First Amended Plan. Plan confirmation should be withheld until an updated Trust Agreement can be put forth.

**III. Debtor has not shown that the plan of reorganization is feasible or fair and equitable to creditors.**

12. The "reorganization" piece of the Plan has always hinged on the idea that the Debtor would use its accrued net operating losses (about $63 million of them) to attract an investor who would "reactivate" the Debtor's business by using the only IP that was not looted from the company during the mid-litigation sale. The Second Amended Plan fills in some of the details the Court found were inexplicably absent during the first two go-rounds. In place of vague assurances about future business prospects, the Amended Plan identifies an investor (B:HIP Global, Inc.),[1] calls for a specific line of credit, wipes out existing equity in place of a new distribution in the reorganized entity, and places a specific timeline on equity redemption for creditors that provides

---

[1] Like Pruvit Ventures, Inc., who acquired substantially all of Debtor's assets in a suspect 2020 transaction, B:HIP is owned by LaCore Enterprises, LLC. ViSalus, Pruvit, B:HIP and LaCore all are headquartered at 901 Sam Rayburn Highway in Melissa, Texas. LaCore Enterprises owns several "network marketing" companies, along with a suite of companies that provide services to LaCore's network marketing subsidiaries. And these LaCore entities appear to sing from the same hymnal when seeking to avoid legal liability: once someone gets close to making them pay, transfer all of a company's valuable assets to a different LaCore entity, and declare bankruptcy, frustrating any attempts to collect.

at least a measure of assurance about whether and when creditors might expect to see recovery. Wakefield appreciates these steps forward. Nevertheless, despite these specifics, the Second Amended Plan continues to be flawed.

        **A.**        **Debtor has not shown that the Second Amended Plan is feasible.**

13. First, while the identification of an investor and an amount and form of investment are material upgrades to the Plan, the continued omission of key details about the reorganized entity precludes a finding of feasibility. *See* 11 U.S.C. § 1129(a)(11).

14. Wakefield's Renewed Objection, Dkts. 66; 77, identified two hurdles to finding that the original Plan was "feasible": (1) The original plan proposed to solicit investment in the reorganized entity, but provided no assurances that any investment would be forthcoming, and (2) the original Plan provided no assurances that the "reactivated" travel-related business would be successful. (¶¶ 11-12.) The Second Amended Plan goes about halfway to solving the first issue by identifying a specific investor and line of credit. But these amendments only invite further questions: Why is the line of credit offered by B:HIP sufficient to get the reorganized entity off the ground? Will the 14% interest rate on the line of credit impede the reorganized entity's success, or prevent returns to creditors? A reorganized entity taking on new debt must generally explain how it will service that debt. *Cf. In re Idearc, Inc.*, 423 B.R. 138, 167-68 (Bankr. N.D. Tex. 2011). Debtor here offers none of that analysis.

15. The omission of any information about the potential reorganized business also precludes a finding of feasibility. Debtor has explained that providing details about the reorganized business is not practical, since many of those decisions would be up to the proposed investor, and whomever they select to run the company. (Dkt. 79, at 78:9-12.) But as the Court observed, there is plenty of information antecedent to that which the Debtor *could* easily provide. (Dkt. 79, at

78:13-23.) For instance, the Debtor might provide some information about the market for travel businesses, what types of opportunities or costs can be expected, or any information that might help creditors understand why it has priced equity in the manner that it has. (*See id.* (noting that "how do you project what's going to happen here?" is not an "unreasonable question[]")).) Ordinarily, a confirmable plan will have "thorough and accurate financial projections." *Matter of Edgewood Food Mart, Inc.*, 666 B.R. 418, 437 (Bankr. N.D. Ga. 2024). These "[p]rojections should show anticipated earnings and expenses, [and] calculate projected disposable income[.]" *In re Premier Glass Servs., LLC*, 664 B.R. 465, 474 (Bankr. N.D. Ill. 2024). Whether or not the specifics of the Second Amended Plan would allow the Debtor to present such details here, an outline explaining how the Debtor expects this to work is the minimum, and despite ample time and opportunity, Debtor does not even try to provide this information.

16.     For these reasons, the Second Amended Plan is not feasible.

**B.     Debtor has not shown that the Second Amended Plan is fair and equitable to creditors.**

17.     Second, the provisions of the Second Amended Plan that allow for payments to the creditor class (and other unsecured creditors) are not "fair and equitable." 11 U.S.C. § 1191(b). The Second Amended Plan grants the Trust a 25% equity stake in the reorganized entity. After 5 years, one of two things will happen: either B:HIP will purchase that stake for $2 million, or all outstanding equity will revert to the Trust.

18.     The issues with this set-up are twofold. First, it requires the Certified Class, in order to get anything, to go into business with individuals who (1) appear to run pyramid schemes (*see supra* ¶ 1), (2) owe them money, and (3) seem to have concealed information in order to prevent the Certified Class from recovering anything outside the bankruptcy process (*see also supra* at note 1). The Debtor should not be permitted to manipulate the bankruptcy process to engineer an

outcome where creditors are forced to be in business with an entity that has a proven track record of questionable decision-making. If the NOLs are valuable (and everyone seems to agree that they are), the Debtor should be able to attach a number to that value, and provide the Certified Class with a lump sum payment.

19.     Second, even at face value, the Second Amended Plan effectively places a hard ceiling on what creditors can recover, and saddles the Trust with all the downside of the new venture. If, at the five-year point, the Trust's share is worth substantially less than $2 million, the purchase right is unlikely to be exercised, and the Trust will obtain a 100% share in a struggling, possibly defunct venture, including taking on whatever the outstanding balance is on the line of credit. If, on the other hand, the Trust's share is worth *more* than $2 million, then the purchase right will almost certainly be exercised, because B:HIP would receive that equity at a discount. At least on these papers, the Trust has no way of preventing a sale in such circumstances.

20.     Moreover, B:HIP holds the purchase option for a period of five years and can elect to exercise that option at any time, apparently without notice to the Trust or creditors. At the least, the Trust should have the option to refuse to sell, or the plan should include a mechanism that allows the Trust to sell at a higher price than $2 million or sooner than the five-year mark (to the extent possible to avoid a change in ownership that would destroy the value of the NOLs, unless other equity holders consent).

21.     This is important because ViSalus's prepetition principals propose to acquire a 26% share in the reorganized entity. That much is permitted in a subchapter V proceeding without the provision of new value. *In re Cleary Packaging, LLC*, 657 B.R. 780, 799 n.47 (Bankr. D. Md. 2023) ("subchapter V allows a debtor's principal to use sweat equity, future income, and other kinds of consideration as a means to retain the principal's ownership interest with respect to

unsecured creditors"). But the proposal triggers other limitations, specifically that "the dissenting unsecured creditors receive value similar to what they would receive in chapter 12 and 13 cases: as much as the debtor can pay." *In re Premier Glass Servs., LLC*, 664 B.R. 465, 472 (Bankr. N.D. Ill. 2024). Debtor proposes to distribute equity with a purchase option rather than disposable income, *see* 11 U.S.C. § 1191(b)(2)(B), but is only able to justify this number by "projecting" that the reorganized entity will have "zero" disposable income. (Second Amended Plan, ¶ 2.4.)

22.     So we are left with two options: either the $2 million purchase option is unfair to creditors because it is, essentially, a way for B:HIP and the Debtor's principals to capture excess value at the expense of creditors , and is therefore not as much as the Debtor can pay, or the $2 million purchase option is merely a way to delay the point at which the creditors will be left holding the bag.

23.     The Debtor has insisted repeatedly that its plan should be preferred by creditors because it is the only way to realize any value beyond the supposed value of the claims held by the estate (which value is, of course, hotly disputed). (Second Amended Plan, ¶ 2.3.) But that is no reason to arbitrarily cap the value that can be captured by creditors through the reorganization process. The Second Amended Plan should not be confirmed with these restrictions attached, as they are not fair and equitable to creditors.

**<u>CONCLUSION</u>**

Wherefore, Wakefield and the Certified Class respectfully request that the Court enter an order denying confirmation of the Second Amended Plan and granting such other relief as the Court deems appropriate under the circumstances.

Dated: February 26, 2026

Respectfully submitted,

*/s/ Audrey L. Hornisher*
Audrey L. Hornisher (TX Bar No. 24094369)
**CLARK HILL PLC**
901 Main Street, Suite 6000
Dallas, Texas 75202
(214) 651-2056
(214) 651-4330 (fax)
ahornisher@clarkhill.com

and

Kevin H. Morse (IL Bar No. 06297244)
*Admitted Pro Hac Vice*
**CLARK HILL PLC**
130 E. Randolph Street, Suite 3900
Chicago, Illinois 60601
(312) 985-5556
(312) 985-5999 (fax)
kmorse@clarkhill.com

and

Patrick S. Ntchobo (CA Bar No. 332593)
*Admitted Pro Hac Vice*
**EDELSON P.C.**
150 California Street, 18th Floor
San Francisco, California 94111
(628) 253-1399
pntchobo@edelson.com

*Attorneys for Lori Wakefield, individually and
on behalf of all others similarly situated*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon all parties that are registered to receive electronic notices via electronic notification pursuant to the ECF procedures in this District on the 26th day of February, 2026, as identified on the service list attached hereto.

*/s/ Audrey L. Hornisher*
Audrey L. Hornisher

ClarkHill\N0940\507107\286647282.v2-2/26/26

## SERVICE LIST

*Served via CM/ECF:*

Christopher E. Prince
Lesnick Prince Pappas & Alverson LLP
315 W. Ninth Street, Suite 705
Los Angeles, CA 90015
cprince@lesnickprince.com
*Attorneys for Debtor*

Jeff Carruth
Weycer, Kaplan, Pulaski & Zuber, P.C.
2608 Hibernia, Suite 105
Dallas, TX 75204
jcarruth@wkpz.com
*Attorneys for Debtor*

Katharine Clark
Thompson Coburn LLP
2100 Ross Avenue, Suite 600
Dallas, TX 75201
kclark@thompsoncoburn.com
*Subchapter V Trustee*

Susan B. Hersh
Office of the U.S. Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242
susan.hersh@usdoj.gov